# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DEONDRA MARKEITH KEEL-HAYWOOD,

       Defendant-Appellant.

UNPUBLISHED
December 11, 2018

No. 338949
Genesee Circuit Court
LC No. 15-038757-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DAQUAVIUS DAVONTE TRAMBLE,

       Defendant-Appellant.

No. 339210
Genessee Circuit Court
LC No. 15-038758-FC

---

Before: BOONSTRA, P.J., and JANSEN and GADOLA, JJ.

PER CURIAM.

In Docket No. 338949 of these consolidated appeals[1], defendant Deondra Markeith Keel-Haywood appeals his convictions, following a jury trial, of second-degree murder, MCL 750.317, assault with intent to murder (AWIM), MCL 750.83, felon in possession of a firearm (felon-in-possession), MCL 750.224f, and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Keel-Haywood as a second habitual offender, MCL 769.10, to concurrent prison terms of 33 to 50 years for the murder and AWIM convictions and 47 to 90 months for the felon-in-possession conviction, to be served consecutively to three concurrent 2-year prison terms for the felony firearm convictions; Keel-Haywood was given credit for 643 days in jail. In Docket No. 339210,

---

[1] *People v Keel-Haywood*, unpublished order of the Court of Appeals, issued July 24, 2018 (Docket Nos. 338949, 339210).

-1-

defendant Daquavius Davonte Tramble appeals his convictions, following a jury trial, of second-degree murder, AWIM, and two counts of felony-firearm. The trial court sentenced Tramble to concurrent prison terms of 375 months to 50 years for the murder and AWIM convictions, to be served consecutively to two concurrent 2-year prison terms for the felony-firearm convictions; Tramble was given credit for 644 days in jail. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

These cases arise out of a shooting on August 29, 2015 on Wisner Street in Flint that resulted in the death of Donnie Younger, Jr. and the injury of Deandrea Shields. The cases were tried jointly before two separate juries.

## A. WISNER STREET SHOOTING

On August 29, 2015, Tramble borrowed Aniesa Alley's car, a black Malibu. Alley, Tramble's girlfriend, lived in Davison, Michigan. Tramble drove Alley's Malibu to a McDonald's restaurant on Clio Road in Flint; his passengers were Keel-Haywood and Keel-Haywood's girlfriend, Sharlyn Dendy.[2]

Several witnesses testified that they had attended a party on Pasadena Street in Flint, and that a group of party attendees left the party around midnight to go to the McDonald's on Clio Road. Tayonna Williams, a relative of both defendants, testified that she was at the party and rode with several other women, including Yamonie Williams[3] (no relation to Tayonna, but a cousin of Younger), to the McDonald's in a truck driven by a woman whose name she did not know. At some point, Yamonie and the driver of the truck began to argue; Tayonna testified that someone called defendants to pick up Tayonna and her friends because the driver did not want them in her vehicle any longer.

Tayonna testified that by the time defendants and Dendy arrived at the McDonald's, Yamonie and the driver of the truck had begun physically fighting. Tramble left the Malibu to attempt to break up the fight. While Tramble and others were attempting to do so, someone retrieved a firearm from the trunk of a black Impala and fired it several times into the air. Several witnesses testified that the gun was fired by a man named James Reed or "JR." However, Reed testified that the shooter was an unknown man with whom he and two others had ridden to the McDonald's in the black Impala. After the gun was fired, everyone in the parking lot ran to various vehicles and left the scene. Tayonna testified that Younger, Shields, Reed, and another unknown individual left in a silver Hyundai driven by Younger. However, Reed testified that he left in the black Impala with several others, including the unknown man who had fired the gun in the parking lot. Yamonie, Tayonna, and Tracy Coleman got into the Malibu along with Dendy, Tramble, and Keel-Haywood and left the area with Keel-Haywood driving. As they

---

[2] Dendy was fifteen years old at the time of the incident. Charges against her arising out of this incident were adjudicated separately in juvenile court.

[3] Due to the similarity of surnames, we will refer to Tayonna Williams and Yamonie Williams by their first names.

drove away, Dendy testified that she heard Tramble say, "they was [sic] shootin' at us" and "we need protection."

Yamonie and Dendy both testified that Keel-Haywood drove the Malibu to Tramble's grandmother's house. Defendants exited the Malibu, went into the house briefly, returned to the Malibu and resumed driving. Dendy testified that they were looking for a friend of theirs so that they could return her phone to her.

As the Malibu driven by Keel-Haywood was traveling southbound on Wisner Street, Yamonie and Dendy testified that they saw Younger's silver Hyundai approaching them northbound on Wisner Street. Yamonie heard one of defendants say, "look, there they go." Tayonna testified that Keel-Haywood parked the Malibu on the corner of Wisner Street and Dartmouth Street; after parking, defendants exited the Malibu and walked to the other side of the street into someone's yard. Tayonna testified that she knew defendants were carrying handguns because she had seen them while riding in the Malibu. Dendy took over driving the Malibu, leaving defendants behind. Yamonie testified that, as they drove off, she saw one of defendants with a gun; she believed it was Tramble. Yamonie testified that after that she "put [her] head down" because she "knew they was goin' shoot [sic] each other." Yamonie heard gunshots as they drove away, but did not see the actual shooting. Dendy also heard gunshots. Tayonna heard a "crash" as they drove away.

Shields testified that he was a passenger, along with two others, in the Hyundai driven by Younger. Shields testified that as they traveled north on Wisner Street, he heard several gunshots and heard bullets hitting the Hyundai. The window next to Shields broke and glass got into his eyes and cut his face; Shields initially believed that he had been shot. The Hyundai crashed into a light pole. Shields and the other occupants ran from the Hyundai, but Younger was unresponsive. Shields was later treated at a hospital for cuts and glass in his face and eyes.

Flint Police and Michigan State Police officers who arrived at the scene found the crashed Hyundai under a still-live electrical wire; it was deactivated by a Consumer's Energy employee. Younger had been shot in the back of the head and killed. The vehicle had been hit by at least five bullets. Nine Winchester brand 9mm Luger caliber shell casings were found near the crash site on Wisner Street. A Michigan State Police firearms expert testified that all of the casings had been fired from the same weapon. A fired bullet found at the scene was of the caliber class that included 9mm Luger. A lead fragment of a bullet removed from Younger's brain could not be matched to a particular caliber.

Shortly after Dendy drove off in the Malibu, she received a phone call from Tramble and drove back to the area to pick up defendants. Tramble drove the Malibu and its occupants back to Alley's house in Davison, where they all spent the night. Yamonie testified that while at Alley's house, she learned from Facebook that Younger had been shot–although she did not learn whether he was alive or dead—and she began crying. She testified that Tramble took her aside and said, "I know that's your cousin" and "I'm sorry" or something like that. Yamonie went to the police a few days later.

Lieutenant Jason Cate was the officer in charge of the homicide case. After Lieutenant Cate interviewed Yamonie and Tayonna, Flint Police arrested defendants and Dendy. Lieutenant Cate interviewed both defendants shortly after the incident. Tramble was re-interviewed by

-3-

Special Agent David Dwyre of the Michigan Department of Attorney General in 2016. Tramble initially told Special Agent Dwyre that Keel-Haywood shot at the Hyundai before it crashed; however, he later stated that he believed the occupants of the Hyundai were shooting at him, so he shot at the Hyundai "once or twice" before the crash.

Tramble also gave a video-recorded statement to Lieutenant Cate and Detective-Sergeant Jeffrey Hook of the Michigan State Police in 2016, portions of which were played only for Tramble's jury; a redacted transcript of that statement was also entered as an exhibit before Tramble's jury. In that statement, Tramble said that he and Keel-Haywood had retrieved guns from a house after the McDonald's shooting, and that both of them had shot at the Hyundai; however, he stated that he fired his gun only after someone had exited the Hyundai and started shooting at him. Tramble also stated that Keel-Haywood had informed him that he should shower to "wash the gunpowder and stuff" off and that "[he] was like, piss on your hands and all that." Both defendants showered and changed clothes after the incident, and Keel-Haywood disposed of the shoes and clothes they had been wearing.

Keel-Haywood stipulated that he was a felon and was not permitted to possess a firearm.

## B. OTHER-ACTS EVIDENCE

### 1. BEFORE BOTH JURIES

Alley testified before both juries that she went to a block party on Dartmouth Street in the summer of 2015, driving defendants and Dendy there in her Malibu. She observed both defendants armed with firearms in their front pockets. Alley left the party briefly; when she returned, she learned that there had been a shooting and that a man had been shot. Alley testified that after the shooting she drove defendants to Keel-Haywood's aunt's house, where defendants changed clothes.

Dendy also testified that she attended the party and heard gunshots, but that she did not see either defendant with a gun or anyone from the party firing guns.

A firearms examiner from the Michigan State Police testified and opined, based on his examination, that two 9mm shell casings recovered from the Dartmouth Street shooting had been fired from the same weapon as the nine shell casings recovered from the Wisner Street shooting.

### 2. BEFORE KEEL-HAYWOOD'S JURY ONLY

Before Keel-Haywood's jury only, Alley additionally testified that Keel-Haywood always carried the same pistol, but that she did not know what type it was.

Sergeant Hook testified about two letters given to him by Dendy's legal guardian that were addressed to Dendy's infant son from Keel-Haywood, although the content of the letters was directed to Dendy herself. Sergeant Hook read excerpts from one of the letters in which the writer advised Dendy that she would have to testify, but that she should "tell them you never seen [sic] us do nothing [sic] so they won't keep having you testify." The writer also stated that "if you say you ain't seen nothing [sic] or you don't know if we went and got guns, I should be home shortly." Attached to the letter was a copy of a page of a police report containing a portion

of the police interview with Yamonie. A sentence from the report was underlined; it read, "She said she was crying, but was afraid if they realized the victim was her cousin they might shoot her." In the margin, with an arrow pointing to the underlined portion of the police report, was the handwritten notation "Bitch, I should have."

In the second letter, the writer stated that "they basically found us a couple blocks away and we was [sic] shooting at the car" and "[t]hat's self-defense all day. My lawyer said zero to seventeen months for the gun and self-defense on the murder." Sergeant Hook acknowledged on cross-examination that handwriting analysis was not performed on these letters.

### 3. BEFORE TRAMBLE'S JURY ONLY

Before Tramble's jury only, Alley testified that "[e]very time [defendants] get into something that they're not supposed to, they always go and change their clothes" because of "the gun residue on their stuff, they just throw them [sic] clothes away." In the video and transcript of Tramble's 2016 statement, he related an earlier incident involving a shooting at a block party on Dartmouth Street. Tramble stated that someone in a car shot at the party-goers, and that people, including Keel-Haywood, fired back; Tramble admitted that he had a gun, but denied firing it that night. Tramble stated that after the shooting Keel-Haywood cleaned himself up in the same manner as he had done after the Wisner Street shooting, but that he (Tramble) had not. Again, this statement was only heard by, and the transcript only provided to, Tramble's jury.

### C. CONVICTIONS AND SENTENCING

Defendants were convicted and sentenced as described. At their sentencing, both defendants were assessed 25 points for offense variable three (OV 3), bodily injury to the victim. These appeals followed.

### II. ADMISSION OF OTHER-ACTS EVIDENCE – BOTH APPEALS

In both appeals, defendants argue that the trial court erred by admitting other-acts evidence concerning the Dartmouth Street block party and shooting. We disagree. Defendants objected to the admission of this evidence via motions in limine, which the trial court denied. The issue is therefore preserved for appeal. We review for an abuse of discretion a trial court's decision to admit other-acts evidence. *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009). A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes. *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007). We review de novo preliminary questions of law, such as the interpretation of statutes and court rules. See *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). Even if other-acts evidence was admitted in error, reversal is not required unless, assessed in the context of the remaining untainted evidence, it affirmatively appears more probable than not that it was outcome determinative. See *People v Denson*, 500 Mich 385, 396-397; 902 NW2d 306 (2017).

Evidence of other acts is generally inadmissible to prove a defendant's propensity to commit such acts. *Denson*, 500 Mich 397. MRE 404(b)(1) governs the admission of other-acts evidence for other purposes, and provides in relevant part:

(1)   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In order for other-acts evidence to be admitted, (1) the prosecution must offer the evidence for a proper purpose, (2) the evidence must be relevant, (3) the probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice, and (4) the trial court may, upon request, provide a limiting instruction to the jury. *Denson*, 500 Mich at 398, citing *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993).  The list of permissible purposes in MRE 404(b)(1) is nonexclusive. *People v Sabin* (*After Remand*), 463 Mich 43, 56; 614 NW2d 888 (2000).

Here, the prosecution offered the evidence to prove identity.  Specifically, the presence of defendants, armed with handguns, at the scene of a previous shooting where shell casings were recovered that matched shell casings found on Wisner Street, tended to prove that defendants were in possession of the weapon that killed Younger and injured Shields.  This was a proper purpose under MRE 404(b)(1).  See *VanderVliet*, 444 Mich at 65.

Moreover, the evidence was logically relevant.  MRE 401, 402.  Evidence that a defendant was in possession of the type of weapon used in a crime is "routinely determined by courts to be direct, relevant evidence of his commission of that offense." *People v Houston*, 261 Mich App 463, 469; 683NW2d 192 (2004).  Therefore, the evidence at issue was relevant to defendants' identity because it did not rely on the juries' inference of defendants' bad character. *Denson*, 500 Mich at 385.  And, despite defendants' contentions to the contrary, the other-acts evidence was not required to be "nearly identical" to the crimes charged, *People v Golochowicz*, 413 Mich 298, 310; 319 NW2d 518 (1982), or bear a "striking similarity" to the crimes charged, *VanderVliet*, 444 Mich at 67.  The prosecution did not rely on a "modus operandi" theory of identity, as the prosecution had in *Golochowicz*.  See *People v Mardlin*, 487 Mich 609, 621; 790 NW2d 607 (2010) (citation omitted).  In other words, it did not seek to create a "theory of relevance based on the alleged similarity between" the other acts and the charged offenses. *Denson*, 500 Mich at 403.  "When the prosecution's theory of relevancy is not based on the similarity between the other act and the charged offense, a 'striking similarity' between the acts is not required." *Denson*, 500 Mich at 403.  Rather, the prosecution merely argued that the presence of defendants at a previous shooting where shell casings were found that matched the shell casings found on Wisner Street supported the "intermediate inference" that the defendants were in possession of the gun that left the shell casings at both scenes. *Id*.

Nor was this evidence unfairly prejudicial.  MRE 403.  As this Court has frequently stated, merely damaging evidence is not unfairly prejudicial; all relevant inculpatory evidence will be damaging to some extent.  See, e.g., *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010); *People v Murphy* (*On Remand*), 282 Mich App 571, 582-283; 766 NW2d 303 (2009).  Rather, "unfair prejudice occurs when there is a tendency that the evidence will be given undue or preemptive weight by the jury, or when it would be inequitable to allow use of

the evidence." *Waclawski*, 286 Mich App at 672 (quotation marks and citation omitted). Here, the evidence was relevant to show that defendants possessed the weapon used in the Wisner Street shooting by showing that defendants and the weapon were present at the same time during another shooting earlier that month. The evidence was not that defendants had fired the weapon at the Dartmouth Street shooting; no one testified during the combined portion of the trial to seeing defendants fire any weapons at all during that incident. Instead, the evidence only established that someone present at both events had fired the weapon. Nor was evidence presented linking the man who was shot on Dartmouth Street to the recovered shell casings. As in *Houston*, the challenged other-acts evidence "did not necessarily portray that defendant[s] committed another crime." *Houston*, 261 Mich App at 468. The danger that the jury would give undue or preemptive weight to this evidence and convict defendants because they were "bad people" was not substantially outweighed by the evidence's probative value. *Id*.

Finally, the trial court gave a limiting instruction directing the jury not to draw an improper character inference. Juries are presumed to follow their instructions. *Id*. at 469. Therefore, the trial court's instruction eliminated any possible unfair prejudice. *Id*. at 470.

The trial court therefore did not abuse its discretion by admitting the other-acts evidence related to the Dartmouth Street shooting that was presented to both juries. *Waclawski*, 286 Mich App at 670. Nor do we find an abuse of discretion in the admission of the additional other-acts evidence related to that shooting that was presented only to Tramble's jury. Alley's testimony about defendants cleaning themselves up after they "get into something that they're not supposed to" was cumulative of Tramble's own statements on the matter, and was in any event extremely unlikely to have impacted the Tramble jury's determination in any significant way in light of the other evidence presented. *Denson*, 500 Mich at 396-397. And although Tramble's statement that Keel-Haywood had fired a gun that night was admitted to Tramble's jury, Tramble did not state that he had encouraged or aided Keel-Haywood in doing so (such that his jury might have concluded that he had aided and abetted Keel-Haywood's commission of a crime). Tramble also did not state that Keel-Haywood had shot anyone. Tramble's statement was merely that Keel-Haywood and others had returned fire after being fired upon. The evidence "did not necessarily portray that defendant[s] committed another crime," apart from the mere possession of a firearm by Keel-Haywood, a felon.[4] *Houston*, 261 Mich App at 468.

## III. KEEL-HAYWOOD'S APPEAL (DOCKET NO. 338949)

### A. ADMISSION OF LETTERS

In Keel-Haywood's main appeal, he additionally argues that the trial court erred by allowing the admission of the letters to Dendy obtained by Sergeant Hook. We disagree. Although defendant includes this argument within his other-acts argument, we agree with the prosecution that the issue is one of the admission of statements by a party opponent, MRE 801(d)(2), and should be analyzed under that standard. See *People v Goddard*, 429 Mich

---

[4] Again, this evidence was not presented before Keel-Haywood's jury.

505, 514-515; 418 NW2d 881 (1988) (noting that a statement by a party opponent was "not a prior act for the purposes of MRE 404(b)").

MRE 801(d)(2)(a) provides that a party's own statement offered against a party is not hearsay. For the admission of statements under MRE 801(d)(2), "the admissibility analysis involves . . . first determining whether the statement was relevant, and second whether its probative value outweighed its possible prejudicial effect." *Goddard*, 429 Mich at 515.[5]

Defendant presents no specific argument concerning the trial court's admission of the letters to Dendy, but merely states that they were written over a year after the offense and were part of "an unduly prejudicial superfluous portrayal of him as a violent and assaultive person." We disagree. Although remoteness in time may, in some cases, limit the logical relevance of the challenged evidence, *People v Yost*, 278 Mich App 341, 405; 749 NW2d 753 (2008), statements that Keel-Haywood made about the Wisner Street shooting a year later to a witness whom he expected to testify were highly relevant to Keel-Haywood's identity as the shooter or aider and abettor. MRE 401, 402; *Yost*, 278 Mich App at 356.

The statements in the letters were also not *unfairly* prejudicial in light of their probative value. MRE 403. While they were undoubtedly damaging to defendant's defense that he was not carrying a gun and did not fire on the Hyundai, they were not unfairly so; admissibility under MRE 403 requires a "balancing analysis" between probative value and prejudicial effect, and highly relevant evidence, such as Keel-Haywood's statements instructing Dendy on what she should say when testifying, indicating that he "should have" shot Yamonie, and stating that he was shooting at the Hyundai and that it was "self-defense all day," requires a much higher risk of unfair prejudice than does marginally relevant evidence. See *People v Blackston*, 481 Mich 451, 461, 462-463; 751 NW2d 408 (2008). Defendant was permitted to argue at trial that the challenged statements could be interpreted in a non-inculpatory way and that the jury should not give the statements any weight. The trial court did not abuse its discretion by admitting the letters. *Waclawski*, 286 Mich App at 670.

## B. HABITUAL OFFENDER NOTICE

In his Standard 4 brief,[6] Keel-Haywood raises an additional issue, arguing that the trial court erred by sentencing him as a habitual offender after the prosecution failed to file, within 21 days after his arraignment, a notice of its intent to seek such a sentencing enhancement. We disagree. Defendant did not raise this issue in the trial court; we therefore review it for plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763-765; 597 NW2d 130 (1999).

---

[5] Although defendant challenged the foundation for the admission of these letters before the trial court, he does not challenge them on that ground on appeal. We therefore leave undisturbed the trial court's finding that the letters were admissible under MRE 901.

[6] A supplemental appellate brief filed in propria persona by a criminal defendant under Supreme Court Administrative Order 2004-6, Standard 4.

MCR 6.112(F) provides:

(F)  Notice of Intent to Seek Enhanced Sentence.  A notice of intent to seek an enhanced sentence pursuant to MCL 769.13 must list the prior convictions that may be relied upon for purposes of sentence enhancement.  The notice must be filed within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived or eliminated as allowed under MCR 6.113(E), within 21 days after the filing of the information charging the underlying offense.

MCR 6.113(E) permits a circuit court, by local administrative order submitted to the State Court Administrator, to eliminate arraignment for defendants represented by an attorney, "provided other arrangements are made to give the defendant a copy of the information and any notice of intent to seek an enhanced sentence, as provided in MCR 6.112(F)."  The 7th Judicial Circuit Court has issued such an order, allowing circuit court judges to eliminate arraignments where a defendant is represented by an attorney.  See 7th Circuit Local Administrative Order 11-04 (effective date November 1, 2011).  The order requires the information to be filed within 14 days of the bind-over date.  *Id*.  The register of actions indicates that Keel-Haywood's bindover occurred on December 29, 2015 and that the prosecution filed the information, its notice of intent to seek an enhanced sentence, and a proof of service on January 12, 2016.  There was thus no error, plain or otherwise.  *Carines*, 460 Mich at 763-765.

IV.  TRAMBLE'S APPEAL (DOCKET NO. 39210)

A.  SUFFICIENCY OF THE EVIDENCE

Tramble additionally argues that the evidence at trial was insufficient to support his convictions for murder and AWIM.  We disagree.  We review de novo a defendant's challenge to the sufficiency of the evidence.  *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).  In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.  See *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).  However, we do not interfere with the factfinder's role of determining the weight of evidence or the credibility of witnesses.  See *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748, amended 441 Mich 1201 (1992).  It is for the trier of fact rather than this Court to determine what inferences can fairly be drawn from the evidence and the weight to be accorded to the inferences.  See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).  The prosecution need not negate every reasonable theory of innocence, but must only prove beyond a reasonable doubt its own theory in the face of whatever contradictory evidence the defendant provides.  *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).  Circumstantial evidence and the reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime.  *People v Carines*, 460 Mich at 757.  We resolve all conflicts in the evidence in favor of the prosecution.  *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

The elements of second-degree murder are "(1) death, (2) caused by defendant's act, (3) with malice, and (4) without justification."  *People v Mendoza*, 468 Mich 527, 534; 664 NW2d 685 (2003).  Malice is the intent to kill or do great bodily harm, or the intent to commit an act in

"wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). Malice may be inferred from evidence that defendant intentionally set in motion a force likely to cause death or great bodily harm. *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009).

The elements of AWIM are "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (quotation marks and citation omitted). To be convicted of AWIM, a defendant must possess the specific intent to kill, rather than merely a wanton and willful disregard of the likelihood that his actions will result in death. *Id*. at 149-150. However, such intent may be inferred from the circumstances of the assault, including "whether the instrument and means used were naturally adapted to produce death." *People v Taylor*, 422 Mich 554, 558; 375 NW2d 1 (1985) (quotation marks and citation omitted).

The aiding and abetting statute, MCL 767.39, provides: "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." Therefore, to convict a defendant under an aiding and abetting theory, the prosecution must show that

> (1) the underlying crime was committed by either the defendant or some other person, (2) the defendant performed acts or gave encouragement that aided and assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving aid or encouragement. [*People v Smielewski*, 235 Mich App 196, 207; 596 NW2d 636 (1999).]

A defendant's mere presence during the commission of a crime, even with knowledge that an offense is about to be committed or is being committed, is insufficient to sustain a conviction on an aiding and abetting theory. *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999).

Tramble argues that the evidence demonstrates that, at best, he was merely present when Keel-Haywood shot at the Hyundai. Tramble ignores his statement to Special Agent Dwyre in which he admitted that he fired at the Hyundai occupied by Younger and Shields. Although Tramble asserted in his interview with Dwyre that he had been fired upon first, no evidence was found that any weapons had been fired from the Hyundai. Further, Tramble's letters strongly imply that he shot at the Hyundai, even if he believed that it was in self-defense.[7] A jury could have found from Tramble's own statements that he was the shooter and possessed the requisite intent to kill for second-degree murder by setting in motion a force likely to cause death or great bodily harm. *Roper*, 286 Mich App at 84, and the intent to kill for AWIM by his use of an instrument and means adapted to produce death. *Taylor*, 422 Mich at 558.

---

[7] Tramble did not present a self-defense theory at trial and does not argue self-defense on appeal.

Further, the evidence demonstrates that Tramble was not merely present at the scene. Even if the jury did not believe that Tramble fired the gun that killed Younger and injured Shields, and even without considering his statements acknowledging that he had fired a gun at the Hyundai, his acts—including allowing Keel-Haywood to drive his girlfriend's Malibu, leaving the Malibu with Keel-Haywood and moving with him to another location, returning to the Malibu, changing his clothes at Keel-Haywood's aunt's house and allowing Keel-Haywood to dispose of his clothes, and staying overnight with Keel-Haywood at Alley's house—show that he was far more than "merely present" when Keel-Haywood committed the acts charged. A rational jury, viewing the evidence in the light most favorable to the prosecution, *Reese*, 491 Mich at 139, could have concluded that Tramble "performed acts or gave encouragement that aided and assisted the commission of the crime" and "intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving aid or encouragement." *People v Smielewski*, 235 Mich App 196, 207; 596 NW2d 636 (1999).

## B. OV 3

Tramble also argues that he should not have been assessed 25 points for OV 3. Tramble acknowledges that our Supreme Court's holding in *People v Houston*, 473 Mich 399, 406-407; 702 NW2d 530 (2005), supports the trial court's score. In *Houston*, our Supreme Court held that a trial court correctly assessed the defendant 25 points for OV 3 for a "life-threatening injury" when the victim was shot and killed and the defendant was convicted of second-degree murder. *Id.* at 401, 407. Tramble argues that *Houston* was wrongly decided and should be reversed by our Supreme Court, but acknowledges that this Court is bound to follow Supreme Court decisions that have not been clearly overruled or superseded. *Associated Builders & Contractors v Lansing*, 499 Mich 117, 191-192; 880 NW2d 765 (2016). Therefore, while Tramble may ask our Supreme Court to overrule *Houston*, and can preserve the argument by asking the trial court and this Court to do so, we may not reach such a result. *Id*.

Affirmed.

/s/ Mark T. Boonstra
/s/ Kathleen Jansen
/s/ Michael F. Gadola